Good morning. I'm William Simpich. I'm the attorney for the Plaintiffs and Appellants. In this action, I'm asking for five minutes on reserve for rebuttal. You have to keep track of your own time because that's the total time. I will, Your Honor. Thank you. And I'm going to keep it relatively short because I think the facts warrant it here. In a word, this is not an inquiry notice case. This is what the court below decided. This is a case of actual knowledge insofar as Melissa Dalton is concerned. I'll come to the Ralph Weber case a little bit later. Melissa Dalton is a plaintiff and lived in the city of Willets much of her life, had no knowledge of the situation at Willets regarding the Remco site and her illnesses. She knew she was ill, but she never connected it until June 2007, and she offered testimony to that effect, which was presented to the court in our opposition to summary judgment as set forth in page four of our reply brief. And it was also set forward in the opposition to summary judgment down below. So the record is well preserved. Nonetheless, in a one-paragraph decision after the court disposed of the inquiry notice approach offered by the defendants, the court simply focused on the titles of two documents presented by the defendants. One document was entitled Potential Client Interview, done by a law firm. The other title was Interview, titled by an investigator. And at the end of the day, when Ms. Dalton was deposed, she repeatedly said, I don't recall these events. She did not say they did not happen. She said she did not recall them. Her testimony that she did not know stands unrebutted. There's simply no evidence that effectively rebuts the fact that she did not know. And with that, I think you're overstating the case. Let's proceed a little bit more precisely. The evidence showing Potential Client Interview was by a plaintiff's law firm representing persons who were injured by the Remco site. Correct. All right. Do you think that a reasonable trier of fact could have found that in that interview, the plaintiff's law firm naturally and normally would have asked whether this person had any injury or illness resulting from exposure to the Remco chemicals? I don't think that would be a reasonable inference, Your Honor, because they could have just as easily been interviewing her as a witness. What would they be talking about, if not that? What she observed as a witness, if anything. As a witness from the Remco site. What do you know about the Remco site? People have been injured in the Remco site. Have you any knowledge about that? But we can't infer what happened in that conversation because we simply do not know. Now, why can't a reasonable finder of fact infer that a conversation between a lawyer who's representing plaintiffs and a person who lives in the town is talking about the case on which the plaintiff's lawyer is representing persons other than she in that town? Well, one thing. Do you think they're talking about whether the Giants will win tonight again? No, they're assessing the situation, Your Honor. That's quite right. The question is what happened in the conversation. We still don't know. It would be an act of mind. Well, you don't know, but my question is, is the fact of the interview circumstantial evidence which would allow a reasonable trier of fact to conclude that the substance of the conversation had to do with the Remco site and injuries that were caused thereon or thereby? I don't think you could make that inference because we literally don't know what the setting was of the conversation. That's your position. You take the same position regarding the interview with Investigator Dunn. Absolutely. I mean, he was employed by the firm to interview witnesses with the purpose of producing evidence for the plaintiff. Right? I think we would have to assume the investigator was trying to obtain evidence for the plaintiff, but we don't know the questions or the content. Right. We don't. But the same question, the circumstances, do they allow a reasonable trier of fact to deduce that the subject matter of the conversation may well have been, more probably than not, whether anybody was injured at the Remco site? I don't think so, Your Honor, because we don't know this. Then it could be that they were talking about the Giants. No, not at all. I'm saying that a good investigator doesn't necessarily tip their hand, period. They may be a friendly witness. They may be a hostile witness. We do not know. And that's, I think, the only fair way for an investigator or a court to approach this question, which is a crucial question. Okay. So if there are any other questions, I will certainly field them. Otherwise, I'd like to go on to the Weber matter. On the Weber matter, there's been a ruling that the other side has provided to the Court on the issue of preconception. However, we contend that we made a much more detailed record down below, and the Court at 681 F. Supp. 1123 did, in fact, address that record that we made. That record was made on a number of theories, including negligence per se and a special relationship on nuisance and on toxic torts and the relationship between that and product's liability. And it's our contention that the standard negligence analysis should be applied here. Rowland v. Christian and its progeny would simply ask the Court to look at Heges, which says, well, you know, it's confined on its facts, but then look at Turpin. We're trying to apply California law, aren't we? That's correct. And Turpin is a California Supreme Court case. Do you want us to take a California Supreme Court case and confine it to its facts? Well, what Heges is an appellate court decision, Your Honor. But Turpin was a Supreme Court, and it's broader. It does not make that kind of rigid formulation. And that's what we're asking the Court to look at here. Wait. Did I understand you correctly that a court of appeals decision in California is not binding because it has been adopted by the Supreme Court of California? No, I'm not suggesting that at all, Your Honor. No, I didn't think so. No, no. We're simply saying we're asking the Court to take the broader interpretation offered by Turpin. And Heges did not forbid this Court in any way from making its own determination. It simply confined it to the facts in that situation. So it's our contention that the Court should look at the foreseeability of the harm, the moral blame to defendant's conduct, the policy of preventing future harm, the fact that insurance is available for this type of injury, and the extent of the burden. Scalia. Those are all elements which the California Supreme Court has stated quite clearly allow a common law court to create a duty. I agree with you. But the question is, under California law, the special relationship which gives rise to a duty as to someone who is injured in the preconception stage has only been applied to a medical professional or a product liability manufacturer as of now, right? Correct. So far. So we don't want to go – are you suggesting that we should extend California law? I am suggesting that this California law does not forbid you from going further afield. So what we're saying is we feel that the door is open for this Court to go further, simply because it has not been fully addressed in this context. It doesn't mean it can't be addressed now. You say that this is what the California courts would do. That's correct. And on what basis do we have to know to say that? I would point to the Turpin case, Your Honor, which specifically left the record open for matters of this type. Let me ask you this. In the Heges case, I don't recall, what was the business or profession of Ungeon Enterprises? I'm sorry, Your Honor. It was a motorist case.  In the Heges case, right? Yes. Was the defendant a product liability, a product manufacturer? No, Your Honor. It was simply a motorist case. Motorist hits a pedestrian. Oh, I see. Okay. Any further questions? Otherwise, I'll sit down. Thank you. Thank you. May it please the Court. Good morning. My name is Colley James. I'm an attorney at Latham & Watkins. We are counsel in this matter for the defendant Appellee's Pepsi Americas. I'd first like to discuss the statute of limitations issue. That's the Dalton case, right? Yes, Your Honor. As my counsel, opposing counsel mentioned, she was born in Willets and lived most of her life there, including the critical time period of 99-2000 through 2003, which is the time when the related Avila case, the case which the decision came down in January as from, was filed to great fanfare and which was followed by many public meetings, investigations, press notices, things of that nature for the next several years. Is there any evidence in the case that Ms. Dalton acknowledged knowledge of the Avila case? No, there is not, Your Honor. All of her claimed injuries relate back to birth or her very early childhood, which is important as well. Because her injuries arose more than two years before she filed her claim and because the exposure that she experienced occurred more than two years before, in order to survive statute of limitations, she has to invoke the discovery rule. And the discovery rule flips the normal burden of proof on establishing whether a claim is time barred. In this case, it comes from Circle and it says, The limitation period begins to run no earlier than the date on which the plaintiff knew or should or reasonably should have known that the personal injury was caused or contributed to by the hazardous substance or pollutant or contaminant concern. And to invoke the discovery rule, the plaintiff must plead facts which show the time and manner of discovery and the inability to have made earlier discovery despite reasonable diligence. Defendants made an extensive showing below on the issue of constructive knowledge, including the tremendous amount of information, publicity, public outreach that went on. The Avila decision discussed that constructive knowledge information and found that in the Avila case on the same evidence, the Court was justifying and saying that people with a reasonable degree of awareness should have known of their claims no later than August 24th of 2000, which is a time period when Ms. Dalton lived in Willetts. But the evidence against Ms. Dalton went one step further. And what we contend recognizes. Kennedy. Yes. Would you be satisfied with the ruling that based on Avila and based on the facts stated in Avila, she had constructive knowledge as of August 24th, 2000, and we don't have to get into the logs of the private law firm and the private investigator? I think the evidence – based on the Court's decision in Avila and the evidence in the record in this case, I think it is fully justified for a decision to come down that says that she had constructive knowledge. Is her situation identical to Avila's? There – I believe the evidence presented in opposition – I believe the evidence is substantially, if not identically – substantially similar, if not identical, to what it was in Avila. Yes, Your Honor. The evidence against Ms. Dalton is clearer than just constructive knowledge. These two documents that we discussed earlier, the evidence that she met with the investigator, Lou Dunn, as well as the potential client interview that was conducted in 2000 by the staff of the law firm. And it's important to note that both of those people or groups, the investigator and the law firm, were in Willits specifically for the purpose of interviewing people regarding RIMCO and whether or not those people could be plaintiffs in a lawsuit. There is no reasonable suggestion that could be made that anything other than RIMCO was discussed in those meetings. Indeed, if that were the case, then the – then the entries wouldn't be on the coverage log in the first place because they would be wholly irrelevant to the matter. So it's an inference – it is a reasonable inference that what was discussed at that meeting was the contamination or the alleged contamination at RIMCO and whether she had injuries that could cause – could lead her to be a plaintiff. At a minimum, these conversations must demonstrate that she should have known about her claims. Remembering that the should-have-known standard is a subjective one, and i.e., would a reasonable person known after these meetings, if not before, have the possibility of a claim? The only legitimate answer is there. We contend it further shows that she had actual awareness of the facts that would lead to a claim, both the contamination and she obviously was aware of her injuries at that point in time. In the absence of any contrary evidence, that reasonable inference becomes the only reasonable inference. And that's the issue here. It isn't what might have happened or could have happened. It's what the evidence in the record demonstrates. Kennedy. Is there any evidence in the record that the plaintiff's – Dalton's injuries could reasonably have been caused by circumstances other than the RIMCO contamination? Well, obviously, if the case had developed further, defendants would have most likely presented expert evidence to that effect. In the record today – See, that would cut in her way, because she'd say, well, yes, I had joint pains and I had swellings and I had headaches and I had nausea, but I thought it was all due to some other cause. She – based on my memory sitting here today, I'm not aware that she had testimony or I don't recall that she had testimony to the effect that she was aware of these injuries and they were just caused – they were caused by something else. I think her testimony is at best that she didn't know what had caused them. And going back to the issue, the evidence before the trial court when it made this decision is, is that plaintiff appellant put forth no evidence to rebut this only reasonable inference? It was her obligation to do so, and she didn't. In the underlying motion – You agree that it's a thin inference without knowing what was actually said? I would not say it's a thin inference. I would say – I would say it's a strong inference that RIMCO and her injuries were the topic of conversation. It's hard to imagine any other discussion that could have taken place, especially when the document itself calls it potential client interview. And it's worth remembering that of the litigants in this case, only Ms. Dalton can and does hold that information. Defendants are at a loss to be able to say exactly what it was because those conversations are attorney-client privilege. They've invoked that right. But the only inference to grow out of that, both the invocation of the privilege and the fact that it was on the privilege log and therefore relevant, was that it dealt with RIMCO and her potential as a client. Now, what did she put up in response? There is – made reference to the fact that she does not remember, she does not recall these conversations. I would submit that when it became her obligation to put up actual evidence in response, that's simply inadequate. It amounts to no evidence at all. It's – the way I like to think of it in a simpler case is a traffic accident. Did you run the red light? I don't know. I don't recall is not a suitable response. It doesn't create a triable issue of fact. And especially – it's especially lacking if you put it up against some other evidence showing that the person did run the red light, a police report, a witness statement. And I submit that the privilege logs amount to that type of evidence. There's a – there's some reference to earlier testimony where she said she doesn't – she didn't meet with him at all. But that – any of that is negated by her subsequent testimony that she does not recall. And, in fact, at her deposition, she was specifically asked, is your answer a no or is it an I don't know? And she said, I don't know, I don't recall. And that is at SER 291. And lastly, a plaintiff can't create a triable issue of fact by contradicting herself, which is in effect what is happening here. In conclusion, remember, it is – it was plaintiff's obligation to put up some firm evidence on the matter. Defendants put up firm admissible evidence of these meetings. The only inference that can come out of that is that claims were discussed that should have put her – or actually did put her on notice of both the contamination and her injuries and the possible link between the two. Plaintiffs put nothing up in response and, therefore, the district court was justified. If any questions – any more questions on this issue, I'll turn to the Weber case. Plaintiff's issue is Ralph Weber. He was born in February of 1976. He never lived in Willetts, never worked in Willetts. Instead, the claim comes through alleged exposure to his mother, his mother who moved away 10 years before in 1966. And the issue turns on whether a duty of care is owed to subsequently conceived offspring. The appellant acknowledges, and as we all do, that duty is – the existence of a duty is a question of the law for the court. And no California case has ever recognized this form of claim in this context. It's only recognized in a very narrow range, in the context of medical services or products directly related to the reproductive process. To extend it to this scenario would extend this line of cases far farther than has ever been contemplated or permitted in any court in California or elsewhere, as far as I know. They rely primarily on two cases, Turpin v. Sortini, 31 Cal. 2nd. 220, the California Supreme Court. But that case did not expand the tort. It is still related to reproductive services. In that case, it was the doctor's negligent failure to identify a hereditary disease, deafness. An important distinction, if not the important distinguishing factor in that case, is the defendants in Turpin did not challenge duty, foreseeability, or proximate cause, which is a very different scenario than we have here. It was really whether just these claims would be allowed and what kind of damages could flow from that type of claim. Hegeus for Ungean, and to respond to your question earlier, Ungean, the defendant, was an operator. Their employee was driving a vehicle, and it struck the vehicle of Ms. Hegeus, the plaintiff. Two years later, she became pregnant. The child was born prematurely. She alleged that it was a result of a shunt that was placed into her following the surgery that caused the premature birth. And again, and Hegeus was very clear in his language, strictly limiting the types of claims to medical services related to reproductive services. Plaintiff appellant relies on language saying that we should not have formulaic conceptions of what a duty is in these contexts. But that language is from the dissent, not the majority, which is an important thing. Instead, the majority was very clear. No duty has ever been found, quote, in a preconception negligent case where a defendant was not a medical professional or a product liability manufacturer. And that's at page 1113 of that case. The Court was very clear to point out that the concept of duty must be kept within a reasonable boundary. In Hegeus, as I mentioned, it was a car accident and the pregnancy occurred two years later. And the Court ruled that that special relationship, the special relationship only exists where the defendant's conduct is, quote, inextricably related to the inevitable future pregnancy. That's at page 1114. Operating a chrome-plating facility, which is what is at issue here, is much more similar to operating in a vehicle than it would be to, for example, a hereditary test in advance of a pregnancy to see whether there was a disease. So I would say... In the Avelik case, was the duty found as to the persons who were injured based on negligence or product liability? Negligence, Your Honor. So that would be similar to the two motorists in Hegeus? Exactly, Your Honor. Beyond all of this, on the issue of foreseeability, plaintiff did not and has not presented any scientific evidence, and I'm not aware of any, that would link the chemicals at issue to the type of birth defect that Ralph Weber claims, which is a blood clotting disorder, whether as a result of direct exposure or as in a preconception exposure scenario. Was it lack of causation the basis for the granting of the motion of summary judgment? No. But, Your Honor, I would say that duty is, inherent in the concept of duty is the foreseeability of an injury that can flow from that. And in this context, there's been no showing, if you want to say that the injury should have been foreseeable, that somebody could develop a blood clotting disorder or birth defect a decade after a mother's exposure. There needs to be some scientific proof that that occurred. And especially in this situation, when you look back at the exposure and therefore the conduct alleged occurred in the late 50s and early 60s and what the state of science was at that time for the concept of foreseeability of duty, then you have an even bigger gap. All right. If there are no further questions, your time has expired. Thank you. I have two brief points. One is that I wanted to mention that the Hague Court explicitly avoided repudiating all nonmedical preconception negligence claims. It found no such duty existed in the context of an auto accident, but it found only that it might be harder to construe a legal duty in such contexts. The other point I wanted to make was going back to the Dalton matter briefly. I wanted to point out to the Court that there is, in fact, affirmative testimony from Ms. Dalton that she did not become aware that her injuries were caused by Remco until late 2006. And the testimony was, so did you, prior to June 2007, did you ever think that your injuries, your illnesses, could be connected to the Remco site? I started, like I said, studying about it in 2006, at the end of 2006. So it was only after you spoke with Maria Brooks in June 2007 that you started to believe that your medical problems could be related to Remco. Or was it before that? It was in two. At the end of 2006, me going on about all the stuff I've been given to read about that I started, you know, and then I was going to these meetings and talking to people, and the more I learned, the more I believed, and the sicker I was in my ongoing health problems, the more I believed it. Can I ask one question? How big is Willetts? Willetts is a town of about 5,000 to 10,000 people. Nothing further? No questions? There don't appear to be any. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Ripple, Bea